

107 S.Ct. 1841                                                                                         Page 1
481 U.S. 429, 107 S.Ct. 1841, 125 L.R.R.M. (BNA) 2073, 95 L.Ed.2d 381, 55 USLW 4576, 106 Lab.Cas. P 12,285
**(Cite as: 481 U.S. 429, 107 S.Ct. 1841)**



Supreme Court of the United States
BURLINGTON NORTHERN RAILROAD COMPANY, et al., Petitioners
v.
BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES et al.

No. 86-39.
Argued Feb. 23, 1987.
Decided April 28, 1987.

Railroads sought a preliminary injunction against secondary picketing by union representing railroad employees. The United States District Court for the Northern District of Illinois, James F. Holderman, Jr., J., granted the railroads' motion for preliminary injunction. The union appealed. The Court of Appeals, Seventh Circuit, 793 F.2d 795, Easterbrook, Circuit Judge, reversed and remanded. On certiorari, the Supreme Court, Justice Brennan, held that under the Norris-LaGuardia Act, a federal court did not have the jurisdiction to enjoin secondary picketing in railway labor cases.

Affirmed.

West Headnotes

**[1] Federal Courts 170B ⇐⇒13.5**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk12 Case or Controversy Requirement
                170Bk13.5 k. Labor Relations; Social Security. Most Cited Cases

A controversy regarding secondary picketing growing out of a railroad labor dispute was not rendered moot by presidential and congressional action on the dispute where the same parties were reasonably likely to find themselves again in dispute over the issues raised in the petition and such disputes typically were resolved quickly by executive or legislative action.

**[2] Labor and Employment 231H ⇐⇒2014**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(L) Injunction
            231HXII(L)1 In General
                231Hk2012 Constitutional and Statutory Provisions
                    231Hk2014 k. Purpose. Most Cited Cases
    (Formerly 232Ak906 Labor Relations)

**Labor and Employment 231H ⇐⇒2075**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(L) Injunction
            231HXII(L)3 Persons Concerned
                231Hk2075 k. Secondary Pressures in General. Most Cited Cases
    (Formerly 232Ak906 Labor Relations)

Under the Norris-LaGuardia Act, Congress intended to preclude courts from enjoining secondary as well as primary strike activity, and railroads were not to be treated any differently than other industries. Norris-LaGuardia Act, § 1 et seq., 29 U.S.C.A. § 101 et seq.

**[3] Labor and Employment 231H ⇐⇒2075**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(L) Injunction
            231HXII(L)3 Persons Concerned
                231Hk2075 k. Secondary Pressures in General. Most Cited Cases
    (Formerly 232Ak906 Labor Relations)

Norris-LaGuardia Act defining "labor dispute" would not be narrowed to exclude secondary activity by adopting a test of "substantial alignment" of a picketed secondary employer with the primary employer. Norris-LaGuardia Act, §§ 1 et seq., 13(a), 29 U.S.C.A. §§ 101 et seq., 113(a).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 3:11-cv-00262-WHR Doc #: 8-1 Filed: 07/29/11 Page: 2 of 15 PAGEID #: 87

107 S.Ct. 1841 Page 2
481 U.S. 429, 107 S.Ct. 1841, 125 L.R.R.M. (BNA) 2073, 95 L.Ed.2d 381, 55 USLW 4576, 106 Lab.Cas. P 12,285
**(Cite as: 481 U.S. 429, 107 S.Ct. 1841)**

**[4] Labor and Employment 231H ⚷1411**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(F) Disputes and Concerted Activities
            231HXII(F)5 Secondary Pressures
                231Hk1409 Particular Activities
                    231Hk1411 k. Picketing. Most Cited Cases
    (Formerly 232Ak344 Labor Relations)

    The Railway Labor Act did not limit the scope of self-help available to a union, including secondary picketing, after the RLA's major dispute resolution procedures were exhausted. Railway Labor Act, § 1 et seq., as amended, 45 U.S.C.A. § 151 et seq.

**[5] Labor and Employment 231H ⚷1411**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(F) Disputes and Concerted Activities
            231HXII(F)5 Secondary Pressures
                231Hk1409 Particular Activities
                    231Hk1411 k. Picketing. Most Cited Cases
    (Formerly 232Ak344 Labor Relations)

    The Railway Labor Act's silence on the issue of secondary picketing by unions did not signify an intent to prohibit secondary picketing, but could just as easily signify intent to allow parties to resort to whatever self-help was legally available at the time a dispute arose. Railway Labor Act, § 1 et seq., as amended, 45 U.S.C.A. § 151 et seq.

**[6] Labor and Employment 231H ⚷2014**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(L) Injunction
            231HXII(L)1 In General
                231Hk2012 Constitutional and Statutory Provisions
                231Hk2014 k. Purpose. Most Cited Cases
    (Formerly 232Ak906 Labor Relations)

**Labor and Employment 231H ⚷2075**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(L) Injunction
            231HXII(L)3 Persons Concerned
                231Hk2075 k. Secondary Pressures in General. Most Cited Cases
    (Formerly 232Ak906 Labor Relations)

    The National Labor Relations Act did not authorize courts to issue injunctions to prohibit secondary picketing by unions; congressional policy expressed in the Act stated that employers were not permitted to obtain injunctions of secondary activity. National Labor Relations Act, § 1 et seq., as amended, 29 U.S.C.A. § 151 et seq.

**[7] Labor and Employment 231H ⚷2075**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(L) Injunction
            231HXII(L)3 Persons Concerned
                231Hk2075 k. Secondary Pressures in General. Most Cited Cases
    (Formerly 232Ak906 Labor Relations)

**Labor and Employment 231H ⚷2086**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(L) Injunction
            231HXII(L)6 Proceedings
                231Hk2086 k. Jurisdiction and Venue. Most Cited Cases
    (Formerly 232Ak906 Labor Relations)

    Under the Norris-LaGuardia Act, a federal court did not have jurisdiction to enjoin secondary picketing in railway labor disputes. Norris-LaGuardia Act, §§ 1 et seq., 13(a), 29 U.S.C.A. §§ 101 et seq., 113(a).

    **\*\*1842** *Syllabus* [FN\*]

FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the conven-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

107 S.Ct. 1841                                                                                                                                                                    Page 3
481 U.S. 429, 107 S.Ct. 1841, 125 L.R.R.M. (BNA) 2073, 95 L.Ed.2d 381, 55 USLW 4576, 106 Lab.Cas. P 12,285
**(Cite as: 481 U.S. 429, 107 S.Ct. 1841)**

ience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*429** Respondent Brotherhood of Maintenance of Way Employes (BMWE) which represents railroad employes nationwide, had a dispute over renewal of a collective-bargaining agreement with a small railroad that is a subsidiary of Guilford Transportation Industries, Inc. (Guilford), which also owns other railroads. After exhausting the settlement procedures mandated by the Railway Labor Act (RLA), BMWE instituted a lawful strike against the Guilford railroads. BMWE later extended its picketing to other railroads (including petitioners) with which Guilford interchanged traffic. In petitioners' consolidated actions, the Federal District Court entered a preliminary injunction against BMWE's picketing of any railroads other than those involved in the primary dispute. The court held that the "substantial alignment" test governs interpretation of the Norris-LaGuardia Act, §§ 1 and 4 of which bar federal courts from issuing injunctions against activities "growing out of" a "labor dispute." Under the test, the scope of lawful strike activity is confined to activities that further the union's economic interests in a labor dispute, and that are directed at the primary employer and other substantially aligned employers-those having an ownership interest in, or providing essential services or facilities to, the primary employer. The court concluded that none of the petitioners were "substantially aligned" with Guilford, and that thus BMWE's secondary activity did not grow out of a labor dispute under the Norris-LaGuardia Act and could be enjoined. The Court of Appeals reversed, concluding that the District Court had no jurisdiction to enter an injunction.

*Held:* Under the Norris-LaGuardia Act, a federal court does not have jurisdiction**\*\*1843** to enjoin secondary picketing in railway labor disputes. Pp. 1846-1855.

(a) The historical background of the Norris-LaGuardia Act-particularly the legislative history showing that Congress was responding to what it considered to be unduly restrictive judicial construction of the anti-injunction provisions of § 20 of the Clayton Act-reveals that Congress intended to preclude courts from enjoining secondary as well as **\*430** primary activity, and that railroads were to be treated no differently from other industries in such regard. Pp. 1846-1848.

(b) Section 13(c) of the Norris-LaGuardia Act defines "labor dispute" as including "any controversy concerning terms or conditions of employment ... regardless of whether or not the disputants stand in the proximate relation of employer and employee," and § 13(a) provides that a case shall be held to "grow out of a labor dispute when the case involves persons who are engaged in the same industry." Under the plain meaning of this language, BMWE's dispute with the primary employer here was unquestionably a labor dispute, and the secondary activity against petitioners grew out of that dispute. Section 13(c)'s definition of "labor dispute" should not be narrowed by adoption of a test of "substantial alignment" of a picketed secondary employer with the primary employer. Congress intended the definition of "labor dispute" to be broad, and adoption of the substantial-alignment test would require courts, contrary to Congress' intent, to second-guess which activities are truly in a union's economic interest in a labor dispute. Moreover, nothing in the Norris-LaGuardia Act or the RLA distinguishes permissible from impermissible secondary activities, and any judicial attempt to limit § 13(c)'s language would make the lawfulness of a strike depend upon judicial views of social and economic policy, which is what the Norris-LaGuardia Act was designed to forestall. Pp. 1848-1850.

(c) Petitioners' contention that the injunction here was valid because, under the RLA, it is illegal for a union to resort to secondary picketing after the parties have exhausted the RLA's major dispute resolution procedures, is without merit. Although the Norris-LaGuardia Act does not deprive a federal court of jurisdiction to enjoin compliance with the RLA's major dispute resolution provisions-involving negotiation, mediation, voluntary arbitration, and conciliation-the RLA does not expressly limit the scope of self-help available to a union once its resolution provisions have been exhausted. The RLA's silence in this regard does not indicate that Congress viewed an express prohibition of secondary picketing to be superfluous and intended to prohibit such picketing. Cf. *Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969). There is no merit to petitioners' contentions that the prohibition in the National Labor Relations Act (NLRA) against some forms of secondary activity should gov-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 3:11-cv-00262-WHR Doc #: 8-1 Filed: 07/29/11 Page: 4 of 15  PAGEID #: 89

107 S.Ct. 1841 Page 4
481 U.S. 429, 107 S.Ct. 1841, 125 L.R.R.M. (BNA) 2073, 95 L.Ed.2d 381, 55 USLW 4576, 106 Lab.Cas. P 12,285
**(Cite as: 481 U.S. 429, 107 S.Ct. 1841)**

ern construction of the RLA. Congressional policy, as expressed in the NLRA, remains that neither employers nor the NLRB are permitted to seek injunctions against the secondary conduct of railway employees. Nor is there any merit to the argument that a ban on secondary picketing may be inferred from the general language of § 2 **\*431** First of the RLA, which places on employees the duty to attempt to settle disputes and thereby avoid any interruption to interstate commerce. Nothing in the RLA indicates that Congress intended to permit federal courts to enjoin secondary activity as a means to settle strikes and avoid interruptions to commerce. Furthermore, the RLA provides a mechanism for the Executive Branch to intervene and interrupt any self-help measures by invoking an Emergency Board, thereby imposing a minimum 60-day cooling-off period. If the Board's recommendations are not initially accepted by the parties, Congress may enforce the Board's recommendation by statute, as was done in this case. Allowing secondary picketing in the self-help period is not inconsistent with the structure **\*\*1844** or purpose of the Act, and may in fact increase the likelihood of settlement prior to self-help. Pp. 1850-1855.

793 F.2d 795 (CA7 1986), affirmed.

BRENNAN, J., delivered the opinion for a unanimous Court.
*Rex E. Lee* argued the cause for petitioners. With him on the briefs were *Carter G. Phillips, Ronald S. Flagg, James S. Whitehead, Lawrence I. Kipperman, Richard J. Schreiber, Mark B. Goodwin,* and *Ronald A. Lane.*

*John O'B. Clarke, Jr.,* argued the cause and filed a brief for respondents.\*

\* Briefs of *amici curiae* urging reversal were filed for the National Industrial Transportation League by *John F. Donelan* and *Frederic L. Wood;* and for the National Railway Labor Conference by *Harry A. Rissetto* and *Thomas E. Reinert, Jr.*

Justice BRENNAN delivered the opinion of the Court.

What began as a dispute over renewal of a collective-bargaining agreement between a small railroad in Maine and some of its employees expanded to picketing and threats of strike activity at railroad facilities around the country. A Federal District Court then enjoined the picketing of any railroads other than those involved in the primary dispute. The question we must decide is whether a federal court has jurisdiction to issue such an injunction.

**\*432** I

Respondent Brotherhood of Maintenance of Way Employes (BMWE) represents railroad employees nationwide. Its members include employees of the Maine Central Railroad and the Portland Terminal Company, subsidiaries of Guilford Transportation Industries, Inc. (Guilford). Guilford also owns two other railroads, the Delaware Hudson Railway Company, and the Boston and Maine Corporation. The Guilford system covers some 4,000 miles of track in the northeast United States, east from Buffalo to Maine, and north from Washington, D.C., to Montreal. The Guilford system is not as large, however, as some other railroads, and Guilford depends on other railroads to carry much of its traffic.

The crux of the dispute between Maine Central and BMWE was Maine Central's decision, following its acquisition by Guilford in 1981, to abolish over a 5-year period the jobs of roughly 300 out of 400 employees represented by BMWE. The collective-bargaining agreement between BMWE and Maine Central expired in 1984, before the parties were able to reach agreement either on the problem of job losses or on various questions of wages, hours, and working conditions. A dispute "over the formation of collective agreements or efforts to secure them" is a "major dispute" in the parlance of railway labor law, *Elgin, J. & E.R. Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945), and is governed by the Railway Labor Act (RLA), 44 Stat. 577, as amended, 45 U.S.C. § 151 *et seq.* For over a year, the parties attempted to reach a settlement by following the detailed settlement procedures mandated by the RLA. On March 3, 1986, having exhausted these procedures, BMWE began a lawful strike against Maine Central and Portland Terminal. Two days later, BMWE lawfully extended the strike to Guilford's other two railroad subsidiaries. [FN1]

> FN1. Guilford unsuccessfully attempted to enjoin this extension of the strike. *BMWE v. Guilford Industries, Inc.,* No. 86-0084-P (D Me. Apr. 2, 1986).

**\*433** It first appeared to BMWE that its strike

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 3:11-cv-00262-WHR Doc #: 8-1 Filed: 07/29/11 Page: 5 of 15  PAGEID #: 90

107 S.Ct. 1841 Page 5
481 U.S. 429, 107 S.Ct. 1841, 125 L.R.R.M. (BNA) 2073, 95 L.Ed.2d 381, 55 USLW 4576, 106 Lab.Cas. P 12,285
**(Cite as: 481 U.S. 429, 107 S.Ct. 1841)**

was having the desired effect of slowing traffic on Guilford's lines. But Guilford's supervisors took on some of the responsibilities of the striking workers, and after several weeks the volume of traffic on Guilford's lines began to increase. BMWE received information that led it to believe that Guilford was receiving financial assistance from other railroads (a belief that later proved mistaken), and observed non-Guilford locomotives moving on Guilford lines. BMWE also perceived that Maine Central had become less willing to negotiate.

In early April, BMWE decided to extend its strike beyond Guilford's subsidiaries. It first attempted to picket other railroads in the east with which Guilford interchanged a significant volume of traffic. This picketing was enjoined by two federal-**\*\*1845** court orders.FN2 On April 8, 1986, BMWE notified the president of the American Association of Railroads of its plans to picket the facilities of other carriers and to ask other carriers' employees to withdraw from service until Maine Central's willingness to bargain increased. In addition, BMWE began to picket "strategic locations through which Guilford's traffic flowed, such as Chicago," Brief for Respondents 4, and to picket the Los Angeles facilities of the Union Pacific Railroad Company, based on the belief (again later proved mistaken) that Union Pacific supervisors were assisting on Guilford lines.

>   FN2. *Consolidated Rail Corp. v. BMWE,* Civ. No. 86-0318T (WDNY Apr. 6, 1986), vacated, 792 F.2d 303 (CA2 1986), cert. pending, No. 86-353; *Richmond, Fredericksburg & Potomac R. Co. v. BMWE,* No. 86-3544 (CA4 Apr. 12, 1986), aff'd, 795 F.2d 1161 (CA4 1986), cert. pending, No. 86-503.

On April 9, 62 railroads (not including petitioner Burlington Northern Railroad Company (Burlington Northern)), filed suit in the United States District Court for the District of Columbia, seeking a temporary restraining order against the picketing. Their request was denied the next day. *Alton & Southern R. Co. v. BMWE,* 639 F.Supp. 220 (1986). Meanwhile, also on April 9, Burlington Northern sought and **\*434** obtained *ex parte* a temporary restraining order from the District Court for the Northern District of Illinois, enjoining BMWE from picketing or striking Burlington Northern. The six other railroad petitioners here quickly filed notices of dismissal in the District of Columbia and then filed new actions against BMWE on April 10 and 11 in the Northern District of Illinois. On April 11, that District Court issued temporary restraining orders in each of these cases enjoining BMWE from picketing and striking the facilities of these seven railroads.

The Illinois District Court then consolidated the cases and held a single hearing on the railroads' motion for a preliminary injunction on April 21, 1986. On April 23, the District Court entered a preliminary injunction. The court noted that §§ 1 and 4 of the Norris-LaGuardia Act, 47 Stat. 70, 29 U.S.C. §§ 101, 104, bar federal courts from issuing injunctions against secondary activity "growing out of any labor dispute." App. to Pet. for Cert. 27a-28a. The court held that these sections were inapplicable, however, because this case did not "grow out of a labor dispute" as that phrase is defined in § 13(a) of the Act, 29 U.S.C. § 113(a). In limiting the range of activity that could be considered to grow out of a labor dispute, the court employed the "substantial alignment" test of *Ashley, Drew & N.R. Co. v. United Transportation Union and Its Affiliated Local No. 1121,* 625 F.2d 1357 (CA8 1980). Under this test, the scope of lawful strike activity (and hence of a labor dispute) is confined to activities that the *court* concludes will "furthe[r] the union's economic interest in a labor dispute." *Id.,* at 1363. Only activities directed at the primary employer and other employers that are substantially aligned with it pass the test. A railroad is substantially aligned with the primary railroad if it has an ownership interest in the primary railroad, or if it provides essential services or facilities to the primary railroad or otherwise shares with it a " 'significant commonality of interest.' " App. to Pet. for Cert. 31a (quoting **\*435***Ashley, Drew, supra,* at 1365). Because none of the railroad petitioners here were "substantially aligned" with Guilford, the court concluded that BMWE's secondary activity did not grow out of a labor dispute for purposes of the Norris-LaGuardia Act and therefore could be enjoined.FN3

>   FN3. In the alternative, the District Court ruled that it had jurisdiction to issue an injunction because BMWE's activity violated the Interstate Commerce Act. 49 U.S.C. § 11101(a). As the Court of Appeals explained, 793 F.2d 795, 800 (CA7 1986), this

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 3:11-cv-00262-WHR Doc #: 8-1 Filed: 07/29/11 Page: 6 of 15 PAGEID #: 91

107 S.Ct. 1841 Page 6
481 U.S. 429, 107 S.Ct. 1841, 125 L.R.R.M. (BNA) 2073, 95 L.Ed.2d 381, 55 USLW 4576, 106 Lab.Cas. P 12,285
**(Cite as: 481 U.S. 429, 107 S.Ct. 1841)**

alternative holding is without merit because "the Norris-LaGuardia Act's ban on federal injunctions is not lifted because the conduct of the union is unlawful under some other, nonlabor statute." *Telegraphers v. Chicago & N.W.R. Co.,* 362 U.S. 330, 339, 80 S.Ct. 761, 766, 4 L.Ed.2d 774 (1960).

In addition, the District Court held that even if the secondary picketing grew out of a labor dispute for purposes of the Norris-LaGuardia Act, the secondary picketing could also be viewed as a major dispute under the RLA between BMWE and *the secondary railroads;* the picketing could then be enjoined because BMWE and these railroads had not yet exhausted the RLA's major dispute procedures. The Court of Appeals rejected this argument, 793 F.2d, at 799, and petitioners have not pursued it here.

**\*\*1846** The Court of Appeals reversed. 793 F.2d 795 (CA7 1986). The court rejected the *Ashley, Drew* substantial-alignment test as inconsistent with both the plain language of the Norris-LaGuardia Act and with this Court's construction of it. The court then turned to an argument raised in but not addressed by the District Court-that secondary picketing is illegal under the RLA, and that the Norris-LaGuardia Act does not prevent courts from enjoining conduct that violates other labor statutes. The court concluded, however, that the RLA does not prohibit secondary picketing. It also observed that, even assuming that the RLA does contain such a prohibition, "the Norris-LaGuardia Act prevents the use of injunctions against economic self-help" once the major dispute resolution process is complete. *Id.,* at 804-805. The court concluded that the District Court had no jurisdiction to enter an injunction, and ordered the District Court to dismiss petitioners' complaints.

[1] **\*436** While these judicial proceedings were pending, Congress and the Executive Branch took steps to resolve the controversy. On May 16, 1986, pursuant to § 10 of the RLA, 45 U.S.C. § 160, the President issued Executive Order No. 12557, 51 Fed.Reg. 18429 (1986). Under this Order, Presidential Emergency Board No. 209 was convened and given the task of investigating the dispute and reporting to the President within 30 days. Section 10 provides that during this 30-day period, and for 30 days after the report is delivered, the parties to the controversy must return to and maintain the status quo prior to the dispute. The Presidential Emergency Board issued its report and recommendations on June 20, 1986. Its recommendations are not binding, however, and the parties did not accept them. On August 21, 1986, Congress passed a joint resolution establishing an advisory board to perform a second investigation and make a report. Four weeks later, on September 8, this board advised Congress that it should enact legislation binding the parties to the recommendation of Presidential Emergency Board No. 209. Congress promptly passed a joint resolution to this effect on September 23, 1986, and seven days later the President signed the bill into law. Pub.L. 99-431, 100 Stat. 987.[FN4]

FN4. These developments do not moot this controversy. Because these same parties are reasonably likely to find themselves again in dispute over the issues raised in this petition, and because such disputes typically are resolved quickly by executive or legislative action, this controversy is one that is capable of repetition yet evading review. See *Weinstein v. Bradford,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (*per curiam*); *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).

We granted certiorari, 479 U.S. 812, 107 S.Ct. 60, 93 L.Ed.2d 19 (1986), to resolve the Circuit conflict over the propriety of using the substantial-alignment test to narrow the definition of labor disputes under the Norris-LaGuardia Act, and to address, if necessary, the applicability of the RLA and §§ 1 and 4 of the Norris-LaGuardia Act to secondary picketing.

**\*437** II

"The Norris-LaGuardia Act ... expresses a basic policy against the injunction of activities of labor unions." *Machinists v. Street,* 367 U.S. 740, 772, 81 S.Ct. 1784, 1802, 6 L.Ed.2d 1141 (1961). Section 1 of the Act states that "[n]o court of the United States ... shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter." 29 U.S.C. § 101. Section 4 enumerates**\*\*1847**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 3:11-cv-00262-WHR Doc #: 8-1 Filed: 07/29/11 Page: 7 of 15 PAGEID #: 92

107 S.Ct. 1841 Page 7
481 U.S. 429, 107 S.Ct. 1841, 125 L.R.R.M. (BNA) 2073, 95 L.Ed.2d 381, 55 USLW 4576, 106 Lab.Cas. P 12,285
**(Cite as: 481 U.S. 429, 107 S.Ct. 1841)**

specific acts that shall not be subject to any restraining order or injunction; these include:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

"(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence." 29 U.S.C. §§ 104(a), 104(e).

The congressional debates over the Norris-LaGuardia Act disclose that the Act's sponsors were convinced that the extraordinary step of divesting federal courts of equitable jurisdiction was necessary to remedy an extraordinary problem. According to the sponsors, federal courts had refused to abide by the clear command of § 20 of the Clayton Act, which stated in part:

"[N]o ... restraining order or injunction shall prohibit any person or persons, whether singly or in concert, ... from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of [so recommending and persuading]; ... or from peaceably assembling in a lawful manner, and for lawful purposes...." 29 U.S.C. § 52.

*438 The language of the Clayton Act was broad enough to encompass all peaceful strike activity, whether directed at the primary employer or at neutral "secondary" employers. Nevertheless, in *Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), the Court held that § 20 did not prevent courts from enjoining secondary activity. In *Duplex,* the employees' primary dispute was with a manufacturer of printing presses in Battle Creek, Michigan. Because a strike by only the employees of the manufacturer was unlikely to succeed, the international union representing the employees expanded the strike to those employers who transported, installed, and serviced the presses. The Court held that Congress did not intend § 20 to protect such an expansion. In reaching this conclusion, the Court appeared to rely not only on certain remarks made during the legislative debates, see *id., at 475-477, n. 1, 41 S.Ct., at 179-180, n. 1,* but also on its more general intuition about the political and economic significance of secondary picketing. Federal courts could enjoin secondary picketing, the Court stated, because "Congress had in mind [the protection of] particular industrial controversies, not a general class war." *Id., at 472, 41 S.Ct., at 178.* See also *Bedford Co. v. Stone Cutters Assn.,* 274 U.S. 37, 60, 47 S.Ct. 522, 529, 71 L.Ed. 916 (1927) (Brandeis, J., dissenting).

[2] The Norris-LaGuardia Act responded directly to the construction of the Clayton Act in *Duplex,* and to the pattern of injunctions entered by federal judges. "The underlying aim of the Norris-LaGuardia Act was to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated, so Congress believed, by unduly restrictive judicial construction." *United States v. Hutcheson,* 312 U.S. 219, 235-236, 61 S.Ct. 463, 468, 85 L.Ed. 788 (1941). Representative LaGuardia's description of the need for the Act is typical of those offered in the House debate:

"Gentlemen, there is one reason why this legislation is before Congress, and that one reason is disobedience of the law on the part of whom? On the part of organized **439 labor? No. Disobedience of the law on the part of a few Federal judges. If the courts had been satisfied to construe the law as enacted by Congress, there would not be any need of legislation of this kind. If the courts had administered even justice to both employers and employees, there would be no need of considering a bill of this kind now. If the courts had not emasculated and purposely misconstrued the Clayton Act, we **1848 would not today be discussing an anti-injunction bill." 75 Cong.Rec. 5478 (1932).[FN5]

> FN5. See also 75 Cong.Rec. 5470 (1932) (statement of Rep. Browning) ("[I]nstead of that [Clayton] act ... being construed as what the Congress intended, it was denatured, emasculated, and tortured into an instrument for further oppression of those whom we sought to relieve.... As an example ... I refer you to the famous Duplex case"); *id.,* at 5468 (statement of Rep. Beedy); *id.,* at 5464 (statement of Rep. O'Connor); *id.,* at 5488 (statement of Rep. Celler); H.R.Rep. No. 669, 72d Cong., 1st Sess., 2-11 (1932); S.Rep. No. 163, 72d Cong., 1st Sess., 7-14,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 3:11-cv-00262-WHR Doc #: 8-1 Filed: 07/29/11 Page: 8 of 15 PAGEID #: 93

107 S.Ct. 1841 Page 8
481 U.S. 429, 107 S.Ct. 1841, 125 L.R.R.M. (BNA) 2073, 95 L.Ed.2d 381, 55 USLW 4576, 106 Lab.Cas. P 12,285
**(Cite as: 481 U.S. 429, 107 S.Ct. 1841)**

16-18 (1932); *United States v. Hutcheson,* 312 U.S. 219, 229-237, 61 S.Ct. 463, 464-469, 85 L.Ed. 788 (1941); *Allen Bradley Co. v. Electrical Workers,* 325 U.S. 797, 803-805, 65 S.Ct. 1533, 1537-1538, 89 L.Ed. 1939 (1945); *Meat Cutters v. Jewel Tea Co.,* 381 U.S. 676, 701-711, 85 S.Ct. 1596, 1609-1615, 14 L.Ed.2d 640 (1965) (opinion of Goldberg, J.).

The Act thus reflects Congress' decision to "abolis[h], for purposes of labor immunity, the distinction between primary activity between the 'immediate disputants' and secondary activity in which the employer and the members of the union do not stand 'in the proximate relation of employer and employee.' " *Woodwork Manufacturers v. NLRB,* 386 U.S. 612, 623, 87 S.Ct. 1250, 1257, 18 L.Ed.2d 357 (1967) (quoting H.R.Rep. No. 669, 72d Cong., 1st Sess., 8 (1932)). [FN6] Moreover, the legislative history leaves no doubt that Congress intended the Norris-LaGuardia Act to cover the railroads. After lengthy debate, punctuated with numerous references to the notorious Pullman Strike of 1894, the House refused an amendment proposed by Representative ***440** Beck that would have exempted railroads from the coverage of the Act. See 75 Cong.Rec. 5471-5480, 5501-5512 (1932). The historical background of the Norris-LaGuardia Act thus reveals that Congress intended to preclude courts from enjoining secondary as well as primary activity, and that the railroads were to be treated no differently from other industries in this regard. [FN7]

> FN6. See also *United States v. Hutcheson, supra,* 312 U.S., at 231, 61 S.Ct., at 465 ("[T]he Act ... established that the allowable area of union activity was not to be restricted, as it had been in the *Duplex* case, to an immediate employer-employee relation").
>
> FN7. The Norris-LaGuardia Act was not Congress' last word on secondary picketing. The 1947 Taft-Hartley and 1959 Landrum-Griffin amendments to the National Labor Relations Act provided the National Labor Relations Board with exclusive authority to seek injunctions in federal court against some forms of secondary activity. 29 U.S.C. §§ 158(b)(4), 160. But as we explain *infra,* at 1852, Congress exempted railroad employers and employees from these amendments, § 152, and so the Norris-LaGuardia Act's prohibition on injunctions applies to railway disputes today, as it did in 1932.

III

We first consider petitioners' argument that § 4's ban on injunctions is inapplicable to this case because the controversy is not one "involving or growing out of" a "labor dispute" under § 4 of the Norris-LaGuardia Act.

Section 13(c) of the Norris-LaGuardia Act states that "[t]he term 'labor dispute' includes any controversy concerning terms or conditions of employment ... regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 113(c). Section 13(a) provides in pertinent part that: "[a] case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry...." § 113(a). If this statutory language is accorded its plain meaning, BMWE's dispute with Maine Central over the terms and conditions of employment is unquestionably a labor dispute, and the secondary activity against petitioners grows out of that dispute.

Petitioners argue, however, that this Court should adopt a test of "substantial alignment" to narrow the scope of labor **\*441** disputes under § 13(c). Petitioners rely on several lower court decisions in which the term "labor dispute" has been applied only to disputes where the picketed employer is "substantially aligned" with the primary employer. See **\*\*1849** *Ashley, Drew & N.R. Co. v. United Transportation Union,* 625 F.2d, at 1363-1364 (citing cases). In *Ashley, Drew,* the court held that secondary picketing "grows out of" a labor dispute only when a court independently determines that the secondary employer is linked economically or otherwise to the primary employer, and that the picketing therefore furthers the union's interests in its primary dispute. Although petitioners endorse *Ashley, Drew,* they also propose an even narrower definition of substantial alignment: "a secondary employer is substantially aligned with a primary employer-and therefore subject to strikes or picketing-only if the secondary employer has 'joined the fray' and thus, in effect, has assumed a role in the primary dispute." Brief for Petitioners 48. Under either test, petitioner railroads argue that they are not substantially aligned with Guil-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 3:11-cv-00262-WHR Doc #: 8-1 Filed: 07/29/11 Page: 9 of 15 PAGEID #: 94

107 S.Ct. 1841 Page 9
481 U.S. 429, 107 S.Ct. 1841, 125 L.R.R.M. (BNA) 2073, 95 L.Ed.2d 381, 55 USLW 4576, 106 Lab.Cas. P 12,285
**(Cite as: 481 U.S. 429, 107 S.Ct. 1841)**

ford, and therefore that this controversy cannot be said to involve or grow out of BMWE's primary dispute with Guilford.

[3] We reject these narrow constructions of § 13(c) for several reasons. First, we have long recognized that "Congress made the definition [of "labor dispute"] broad because it wanted it to be broad.... Congress attempted to write its bill in unmistakable language because it believed previous measures looking toward the same policy against nonjudicial intervention in labor disputes had been given unduly limited constructions by the Courts." *Telegraphers v. Chicago & N.W.R. Co., 362 U.S. 330, 335-336, 80 S.Ct. 761, 764, 4 L.Ed.2d 774 (1960)*; see also *Marine Cooks & Stewards v. Panama S.S. Co., 362 U.S. 365, 369, 80 S.Ct. 779, 783, 4 L.Ed.2d 797 (1960)* ("The [Act's] language is broad because Congress was intent upon taking the federal courts out of the labor injunction business except in the very limited circumstances left open for federal jurisdiction under the Norris-LaGuardia Act").

*442 Accordingly, we have consistently declined to construe § 13(c) narrowly. For example, we have interpreted § 13(c) to embrace disputes "having their genesis in political protests" as opposed to economic self-interest. *Jacksonville Bulk Terminals, Inc. v. Longshoremen, 457 U.S. 702, 711, 102 S.Ct. 2672, 2679, 73 L.Ed.2d 327 (1982)*.[FN8] It would be particularly anomalous to adopt a narrowing construction of the phrase "growing out of a labor dispute" in the context of secondary picketing, because Congress' primary motivation in passing the Norris-LaGuardia Act was to immunize such picketing from federal-court injunctions. Were we to limit the scope of § 13(c) as petitioners suggest, we would again commit precisely the error that prompted Congress to pass the Act.

FN8. See also *Marine Cooks & Stewards v. Panama S.S. Co., 362 U.S. 365, 80 S.Ct. 779, 4 L.Ed.2d 797 (1960)* (picketing by American seamen of foreign ship with foreign crew to protest loss of American jobs to foreign competition held to grow out of a labor dispute); *New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012 (1938)* (picketing by civic group to induce store to hire Negro employees held to grow out of a labor dispute).

Adoption of some variant of the substantial-alignment test would be contrary to the Act in yet another way. The focus of the substantial-alignment test-whether labor activity will "furthe[r] the union's economic interest in a labor dispute," *Ashley, Drew, supra,* at 1363-requires courts to second-guess which activities are truly in the union's interest. As the Court of Appeals explained:

"No union engages in secondary conduct without expecting to advance its economic interests.... Unions do not lightly call in their chips and impose burdens on other workers who find their own pay and working conditions satisfactory.... Under the 'substantial alignment' test of *Ashley, Drew* the court must ... weig[h] the economic gains to the union's members from secondary pressure against the losses the secondary conduct imposes on others in society. It is only a small exaggeration to say that this is exactly what courts were doing *443 before 1932, exactly why Congress passed the Norris-LaGuardia Act." *793 F.2d, at 806*.

**1850 Finally, nothing in the Norris-LaGuardia Act or the RLA distinguishes permissible from impermissible secondary activity. As we observed in *Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 386-387, 89 S.Ct. 1109, 1120, 22 L.Ed.2d 344 (1969)*:

"No cosmic principles announce the existence of secondary conduct, condemn it as an evil, or delimit its boundaries. These tasks were first undertaken by judges, intermixing metaphysics with their notions of social and economic policy. And the common law of labor relations ... has drawn no lines more arbitrary, tenuous, and shifting than those separating 'primary' from 'secondary' activities."

For the railway industry, unlike other industries covered by the National Labor Relations Act (NLRA), Congress has provided "neither usable standards nor access to administrative expertise" to facilitate the difficult task of distinguishing primary and secondary activity. *Id., at 392, 89 S.Ct., at 1123.* Given the inherent indeterminacy of these concepts and the lack of congressional guidance, it is obvious that any judicial attempt to limit the language of § 13

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 3:11-cv-00262-WHR Doc #: 8-1 Filed: 07/29/11 Page: 10 of 15  PAGEID #: 95

107 S.Ct. 1841                                                                                                              Page 10
481 U.S. 429, 107 S.Ct. 1841, 125 L.R.R.M. (BNA) 2073, 95 L.Ed.2d 381, 55 USLW 4576, 106 Lab.Cas. P 12,285
**(Cite as: 481 U.S. 429, 107 S.Ct. 1841)**

would make "the lawfulness of a strike ... depend upon judicial views of social and economic policy." *Jacksonville Bulk Terminals, Inc., supra,* 457 U.S., at 715, 102 S.Ct., at 2681. Even if we were confident that our mixture of metaphysics and social policy, unlike that of our predecessors earlier in this century, would produce a construction of § 13(c) that would substantially align with Congress' contemporary views, the fact remains that Congress passed the Norris-LaGuardia Act to forestall judicial attempts to narrow labor's statutory protection. Accordingly, we refuse to narrow the definition of "labor dispute" under § 13(c) to exclude those battles involving secondary activity.

**\*444** IV

In certain limited circumstances, the Norris-LaGuardia Act does not prevent a court from enjoining violations of the specific mandate of another labor statute. Petitioners claim that the injunction here was valid because, under the RLA, it is illegal for a union to resort to secondary picketing after the parties have exhausted the major dispute resolution procedures. To evaluate this argument, we must briefly review the RLA.

The Railway Labor Act "cannot be appreciated apart from the environment out of which it came and the purposes which it was designed to serve." *Elgin, J. & E.R. Co. v. Burley,* 325 U.S. 711, 751, 65 S.Ct. 1282, 1303, 89 L.Ed. 1886 (1945) (Frankfurter, J., dissenting). Following decades of labor unrest that persistently revealed the shortcomings of every legislative attempt to address the problems, representatives of railroad labor and management created a system for dispute resolution that Congress enacted as the RLA in 1926.[FN9] The RLA subjects all railway disputes to virtually endless "negotiation, mediation, voluntary arbitration, and conciliation."[FN10] **\*\*1851\*445***Detroit & Toledo Shore Line R. Co. v. Transportation Union,* 396 U.S. 142, 148-149, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969) (*Shore Line*). Moreover, the RLA requires all parties both "to exert every reasonable effort to make and maintain" collectively bargained agreements, § 2 First, and to abide by the terms of the most recent collective-bargaining agreement until all the settlement procedures provided by the RLA have been exhausted, §§ 5, 6, 10; see *Shore Line, supra,* at 150-153, 90 S.Ct., at 299-301. Nevertheless, if the parties exhaust these procedures and remain at loggerheads, they may resort to self-help in attempting to resolve their dispute, subject only to such restrictions as may follow from the invocation of an Emergency Board under § 10 of the RLA. See *Trainmen v. Jacksonville Terminal Co., supra,* 394 U.S., at 378-379, 89 S.Ct., at 1115 (citing "long line of decisions" upholding parties' right to self-help following exhaustion).

FN9. See, *e.g,* G. Eggert, Railroad Labor Disputes (1967); L. Lecht, Experience Under Railway Labor Legislation 14-57 (1955); *Machinists v. Street,* 367 U.S. 740, 755-758, and nn. 11, 12, 81 S.Ct. 1784, 1792-1795, and nn. 11, 12, 6 L.Ed.2d 1141 (1961); *Elgin, J. & E. R. Co. v. Burley,* 325 U.S. 711, 751-753, 65 S.Ct. 1282, 1302-1304, 89 L.Ed. 1886 (1945) (Frankfurter, J., dissenting); *Virginian R. Co. v. Railway Employees,* 300 U.S. 515, 542-543, 57 S.Ct. 592, 596-597, 81 L.Ed. 789 (1937).

FN10. The RLA's procedures for resolving a major dispute, such as the one between BMWE and Guilford, were summarized by the Court in *Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969):

> "The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens 'substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President,' who may create an emergency board to investigate and report on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 3:11-cv-00262-WHR Doc #: 8-1 Filed: 07/29/11 Page: 11 of 15 PAGEID #: 96

the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo.* §§ 2 Seventh, 5 First, 6, 10."

If the RLA is to function as its framers intended, compliance with its mandates obviously is essential. To accommodate the competing demands of the RLA and the Norris-LaGuardia Act, our cases establish that the Norris-LaGuardia Act

"does not deprive the federal court of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act. *Virginian R. Co. v. [Railway Employees],* 300 U.S. 515 [57 S.Ct. 592, 81 L.Ed. 789]; *Graham v. Brotherhood of Locomotive Firemen & Enginemen,* 338 U.S. 232 [70 S.Ct. 14, 94 L.Ed. 22 (1949) ]." *Machinists v. Street,* 367 U.S., at 772-773 [81 S.Ct., at 1802]; see also *Chicago & N.W. R. Co. v. Transportation Union,* 402 U.S. 570, 581-582 [91 S.Ct. 1731, 1737-1738, 29 L.Ed.2d 187] (1971).[FN11]

> FN11. In *Virginian R. Co.,* for example, the Court held that § 2 Ninth of the Act was a "command to the employer to 'treat with' the authorized representative of the employees," and that this legal obligation was enforceable in equity notwithstanding the Norris-LaGuardia Act. 300 U.S., at 546-547, 562-563, 57 S.Ct., at 599, 606-607. In *Graham,* the Court held that federal courts may enjoin compliance with the "Railway Labor Act provisions insuring [employees'] right to nondiscriminatory representation by their bargaining agent." 338 U.S., at 240, 70 S.Ct., at 18; see also *Steele v. Louisville & Nashville R. Co.,* 323 U.S. 192, 199-203, 65 S.Ct. 226, 230-232, 89 L.Ed. 173 (1944). Similarly, in *Detroit & Toledo Shore Line R. Co. v. Transportation Union,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969), the Court held that federal courts could enjoin parties to adhere to the status quo requirement embodied in the specific language of §§ 5, 6, and 10 of the RLA.

**\*446** This exception is necessarily a limited one. Even when a violation of a specific mandate of the RLA is shown, "[c]ourts should hesitate to fix upon the injunctive remedy ... unless that remedy alone can effectively guard the plaintiff's right." *Machinists, supra,* 367 U.S., at 773, 81 S.Ct., at 1802.

[4] Petitioners concede, as they must, that the RLA does not contain an express mandate limiting the scope of self-help available to a union once the RLA's major dispute resolution procedures have been exhausted. They argue, however, that the drafters of the RLA did not need to insert an express prohibition of secondary picketing because in 1926 federal law clearly prohibited such picketing. Because language banning that which was already illegal would have been superfluous, petitioners construe the RLA to adopt the limits on self-help that existed at the time the RLA became law.[FN12]

> FN12. Petitioners argue that the legislative history of the Norris-LaGuardia Act supports this view. As we noted *supra,* at 1848, however, Congress rejected Representative Beck's amendment exempting railroads from the Norris-LaGuardia Act. Petitioners argue that Congress did so on the understanding that secondary picketing was already illegal under the Railway Labor Act and that nothing in the Norris-LaGuardia Act would change that. Reply Brief for Petitioners 14-17. But nowhere in the legislative debates does any Representative state that secondary activity is illegal under the RLA. Rather, in response to Representative Beck's proposed amendment, Representative LaGuardia stressed that the RLA "provided the machinery ... for settling labor disputes," and that the RLA "takes care of the whole labor situation pertaining to the railroads." 75 Cong.Rec. 5499 (1932). These statements do not necessarily imply that the RLA bans secondary activity, but rather suggest that the RLA's dispute resolution procedures already provided a mechanism by which to avoid secondary activity in the railway industry. We thus are not persuaded that Congress rejected Representative Beck's amendment on the understanding that courts had the power under the RLA to enjoin secondary picketing during the period of self-help.

**\*\*1852** [5] **\*447** Petitioners read too much, however, into the silence of the Act. The RLA's si-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 3:11-cv-00262-WHR Doc #: 8-1 Filed: 07/29/11 Page: 12 of 15  PAGEID #: 97

lence could just as easily signify an intent to allow the parties to resort to whatever self-help is legally available at the time a dispute arises. Faced with a choice between the ambiguity in the RLA and the unambiguous mandate of the Norris-LaGuardia Act, we choose the latter.<sup>FN13</sup>

> FN13. The circumstances surrounding the passage of the RLA suggest another reason to reject petitioners' construction. Unlike the legislation that preceded it, the RLA was negotiated and agreed to by the railroads and the Brotherhoods, and is "probably unique in having been frankly accepted as such by the President and Congress." *Elgin, J. & E.R. Co. v. Burley,* 325 U.S., at 753, 65 S.Ct., at 1303 (Frankfurter, J., dissenting). There was substantial disagreement in the 1920's between Congress and the courts over the legal status of secondary activity, and the unions at that time were exerting substantial efforts to persuade Congress to override the courts' construction of the Clayton Act. Given these circumstances, it is unwise to read into the RLA's silence on self-help an expression of enduring allegiance to the labor law of 1926. See *Trainmen v. Jacksonville Terminal Co.,* 394 U.S., at 382, 89 S.Ct., at 1117; n. 5, *supra.*

Indeed, this Court has already refused to find in the silence of the RLA an intent to prohibit secondary picketing. In *Trainmen v. Jacksonville Terminal Co., supra,* we held that state courts may not enjoin secondary picketing in a railway dispute after parties exhaust the RLA's procedures. We noted that Congress had not provided the courts with the standards needed to distinguish primary from secondary picketing, and that "parties who have unsuccessfully exhausted the Railway Labor Act's procedures for resolution of a major dispute ... [may] employ the full range of whatever peaceful economic power they can muster, so long as its use conflicts with no other obligation imposed by federal law." 394 U.S., at 392, 89 S.Ct., at 1123. We concluded that, in railway disputes, "until Congress acts, picketing-whether characterized as **\*448** primary or secondary-must be deemed conduct protected against state proscription." *Id.,* at 392-393, 89 S.Ct., at 1123.

Petitioners note that our decision in *Trainmen v. Jacksonville Terminal Co.* did not require us to determine the scope of federal-court injunctive power under the RLA, nor to assess the applicability of the Norris-LaGuardia Act to either the state- or federal-court injunctive power. See *id., at 382, n. 18, 89 S.Ct., at 1117, n. 18.* Nevertheless, the primary rationale for our decision-that "we have been furnished by Congress neither usable standards nor access to administrative expertise" in evaluating the lawfulness of secondary picketing-remains equally persuasive today, for in the 18 years since our decision Congress has provided no guidance on the subject. Where the Judiciary lacks manageable standards, federal courts should not enter where state courts are forbidden to tread.

Petitioners next maintain that when, as here, the RLA does not provide a clear answer to a particular problem, this Court has looked to the NLRA "for assistance in construing" the RLA. *Trainmen v. Jacksonville Terminal Co.,* 394 U.S., at 383, 89 S.Ct., at 1118. Petitioners argue that the NLRA embodies Congress' view that secondary activity is an unfair labor practice, and that this view should govern our construction of the RLA.

[6] The NLRA does not contain a "sweeping prohibition" of secondary activity;**\*1853** instead it "describes and condemns specific union conduct directed to specific objectives." *Carpenters v. NLRB,* 357 U.S. 93, 98, 78 S.Ct. 1011, 1015, 2 L.Ed.2d 1186 (1958). Moreover, the NLRA does not permit employers to seek injunctions against the activity that it does prohibit. It grants to the National Labor Relations Board (NLRB) exclusive authority to seek injunctions against some forms of secondary activity. 29 U.S.C. § 158(b)(4), 160(j), 160(*l* ). Thus, congressional policy, as expressed in the NLRA, remains that employers are not permitted to obtain injunctions of secondary activity. Finally, it is significant that Congress excluded rail carriers **\*449** and rail employees from the coverage of the NLRA: even the NLRB has no authority to seek injunctions in railway disputes. §§ 152(2), 152(3). We conclude that the NLRA could not make clearer Congress' intent to prohibit federal courts from issuing the injunctions sought in this case.

Petitioners next argue that in some cases the Court has allowed an injunction to issue to enforce a duty that is merely *inferred* from the language and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 3:11-cv-00262-WHR Doc #: 8-1 Filed: 07/29/11 Page: 13 of 15 PAGEID #: 98

107 S.Ct. 1841 Page 13
481 U.S. 429, 107 S.Ct. 1841, 125 L.R.R.M. (BNA) 2073, 95 L.Ed.2d 381, 55 USLW 4576, 106 Lab.Cas. P 12,285
**(Cite as: 481 U.S. 429, 107 S.Ct. 1841)**

structure of the Act. In *Trainmen v. Chicago R. & I. R. Co.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957) (*Chicago River* ), for example, the Court held that federal courts may enjoin a strike over a minor dispute in order to enforce compliance with § 3 First of the RLA, which provides for compulsory arbitration of minor disputes before the National Railroad Adjustment Board. Petitioners note that nothing in § 3 First expressly forbids a union to strike over a minor dispute, and argue that the Court necessarily *inferred* the prohibition against strikes during compulsory arbitration from the language and legislative history of the RLA. Similarly, in *Chicago & N.W.R. Co. v. Transportation Union,* 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971) ( *Chicago & North Western* ), the Court held that a federal court may enjoin a strike following the exhaustion of major dispute resolution procedures if a union does not comply with its obligation under § 2 First of the RLA "to exert every reasonable effort" to resolve the dispute. 45 U.S.C. § 152 First. Petitioners note that nothing in § 2 First expressly declares that its obligations are enforceable during the period of self-help, and therefore argue that in *Chicago & North Western,* as in *Chicago River,* the Court allowed federal courts to enforce by injunction a duty that was merely inferred from the Act.[FN14]

>   FN14. Petitioners also rely on a third case, *Railway Clerks v. Florida E.C. R. Co.,* 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966) (*Florida East Coast* ), in which the Court held that a carrier's right to self-help following the exhaustion of major dispute resolution procedures included a right to deviate from the terms of the pre-existing collective-bargaining agreement in engaging supervisors and non-union employees to replace the striking employees, and that this right could be enforced by an injunction approving the change in terms and specifying that the deviations would be abandoned at the conclusion of the strike. Petitioners argue that, in light of the express language of § 2 Seventh prohibiting carriers from unilaterally altering the terms of an agreement, the basis for the Court's ruling must be an inference from the structure and purposes of the Act. But in *Florida East Coast* the Court was not confronted with a question whether § 4 of the Norris-LaGuardia Act would prohibit the injunction, for the injunction at issue there did not prohibit the sort of strike activity that § 4 protects. Instead, the Court's task was to construe the scope of the employer's right to self-help with reference simply to the RLA itself. The Court's conclusion-that a right to deviate from the requirements of § 2 Seventh was essential lest the employer's right to self-help become "academic"-was one that rested solely on a construction of the RLA. *Id.,* at 246, 86 S.Ct., at 1424. Because the anti-injunction mandate of § 4 was neither mentioned nor implicated by *Florida East Coast,* that decision does not bear on the question presented here.

**\*450** Turning to this case, petitioners argue that a ban on secondary picketing may be inferred from the general language of § 2 First. Section 2 First states that:

> "It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or **\*\*1854** otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152 First.

Petitioners place particular emphasis on the duty this section places on employees to attempt to settle disputes and thereby avoid any interruption to interstate commerce. This duty, petitioners correctly note, is consistent with the major purpose of Congress in passing the RLA: " '[T]o prevent, if possible, wasteful strikes and interruptions of interstate commerce.' " Brief for Petitioners 14, quoting *Shore Line,* 396 U.S., at 148, 90 S.Ct., at 298. See also H.R.Rep. No. 328, 69th Cong., 1st Sess., 1 (1926). Petitioners conclude that construing**\*451** the RLA to allow unions to resort to secondary activity is manifestly inconsistent with the major purpose of the RLA.[FN15]

>   FN15. It is of course appropriate to construe a particular provision of an Act in light of the Act's structure and purpose. *United States v. Heirs of Boisdoré,* 8 How. 113, 122, 12 L.Ed. 1009 (1849); *United States v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

107 S.Ct. 1841 Page 14
481 U.S. 429, 107 S.Ct. 1841, 125 L.R.R.M. (BNA) 2073, 95 L.Ed.2d 381, 55 USLW 4576, 106 Lab.Cas. P 12,285
**(Cite as: 481 U.S. 429, 107 S.Ct. 1841)**

*Hutcheson,* 312 U.S., at 235, 61 S.Ct., at 467. The inference that petitioners ask us to make, however, is different in character from inferences we have made in past cases involving the RLA and the Norris-LaGuardia Act.

In *Chicago River,* for example, our point of departure was the express language of § 3 First, which unambiguously compelled arbitration of minor disputes; the only inference drawn was that a strike was incompatible with this explicit obligation. "[T]he *Chicago River* case [thus] held that a strike could be enjoined to prevent a plain violation of a basic command of the Railway Labor Act...." *Telegraphers v. Chicago & N.W.R. Co.,* 362 U.S., at 338-339, 80 S.Ct., at 766. In the instant case, by contrast, there is no "basic command" of the RLA which the union can be said plainly to have violated. We are asked in this case to infer not only that a union's duty to refrain from secondary activity is so crucial to the operation of the Act that it may be enforced by injunction, but also that such a duty exists.

In *Chicago & North Western,* we began by noting that the express language of § 2 First creates a duty to "exert every reasonable effort" to settle disputes. The only inference we drew here was that this duty was a legal obligation enforceable by injunction under certain circumstances. The language of § 2 First does not contain, however, either an express proscription of secondary activity or a suggestion that the scope of self-help is limited. Our currently narrow exception to the Norris-LaGuardia Act's prohibition on injunctions would expand to swallow the rule were we to permit courts to enforce by injunction the obligation petitioners infer here.

[7] Although we agree with petitioners that the primary goal of the RLA is to settle strikes and avoid interruptions to commerce, we see nothing in the RLA to indicate that Congress intended to permit federal courts to enjoin secondary activity as a means toward that end. An injunction does not settle a dispute-it simply disables one of the parties. Moreover, "in view of the interests of both parties in avoiding a strike," *Virginian R. Co. v. Railway Employees,* 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937), the availability of such self-help measures as secondary picketing may increase the effectiveness of the RLA in **\*452** settling major disputes by creating an incentive for the parties to settle prior to exhaustion of the statutory procedures:

"Underlying the entire statutory framework is the pressure born of the knowledge that in the final instance traditional self-help economic pressure may be brought to bear if the statutory mechanism does not produce agreement.... As the statutory machinery nears termination without achieving settlement, the threat of economic self-help and the pressures of informed public opinion create new impetus toward compromise and agreement." *Chicago & North Western,* 402 U.S., at 597-598, 91 S.Ct., at 1745 (BRENNAN, J., dissenting).

Furthermore, as this case illustrates, § 10 of the RLA provides a ready mechanism for the Executive Branch to intervene and interrupt any self-help measures by invoking an Emergency Board and thereby imposing at a minimum a 60-day cooling-off period. If the Board's recommendations are not initially accepted by the parties, Congress has the power to enforce the **\*\*1855** Board's recommendation by statute, as it has done here. Allowing secondary picketing in the self-help period is thus not inconsistent with the structure or purpose of the Act, and may in fact increase the likelihood of settlement prior to self-help. This is therefore not a case in which "the scheme of the Railway Labor Act could not begin to work without judicial involvement." *Chicago & North Western, supra,* at 595, 91 S.Ct., at 1744 (BRENNAN, J., dissenting).

While opinions regarding the RLA's success in meeting its goals have varied over time, it does appear that under the RLA labor and management have been able to resolve most conflicts without resort to secondary picketing. [FN16] We decline,**\*453** at this advanced stage of the RLA's development, to find in it an implied limit on a union's resort to secondary activity. Instead, "if Congress should now find that abuses in the nature of secondary activities have arisen in the railroad industry ... it is for the Congress, and not the Courts, to strike the balance 'be-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tween the uncontrolled power of management and labor to further their respective interests.' " *Trainmen v. Jacksonville Terminal Co., 394 U.S., at 392, 89 S.Ct., at 1123*.

> FN16. "In the history of the Railway Labor Act there have been only three widely-known labor disputes in which rail unions have undertaken any secondary economic activity." Brief for National Railway Labor Conference as *Amicus Curiae* 27. In making this statement, *amicus* refers to the Florida East Coast Railway dispute of the early 1960's, see *Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969); the 1978 dispute between the Norfolk and Western Railway and the Brotherhood of Railway and Airline Clerks, see *Consolidated Rail Corp. v. Railway Clerks,* 99 BNA LRRM 2607 (WDNY 1978), appeal dism'd as moot, 595 F.2d 1208 (CA2 1979); and the dispute at issue here involving Guilford and BMWE. Brief for *Amicus Curiae, supra,* at 27.

V

"Th[e] judge-made law of the late 19th and early 20th centuries was based on self-mesmerized views of economic and social theory ... and on statutory misconstruction." *Trainmen v. Jacksonville Terminal Co., supra,* 394 U.S., at 382, 89 S.Ct., at 1117. It may be that the evolution of judicial attitudes toward labor in "the decades since the Norris-LaGuardia Act was passed has dissipated any legitimate concern about the impartiality of federal judges in disputes between labor and management." *Buffalo Forge Co. v. Steelworkers,* 428 U.S. 397, 432, 96 S.Ct. 3141, 3159, 49 L.Ed.2d 1022 (1976) (STEVENS, J., dissenting). But our decision in this case ultimately turns not on concerns of partiality, but on questions of power. In the Norris-LaGuardia Act, Congress divested federal courts of the power to enjoin secondary picketing in railway labor disputes. Congress has not seen fit to restore that power. Accordingly, we affirm the decision of the Court of Appeals.

*It is so ordered.*

U.S.Ill.,1987.
Burlington Northern R. Co. v. Brotherhood of Maintenance of Way Employees

481 U.S. 429, 107 S.Ct. 1841, 125 L.R.R.M. (BNA) 2073, 95 L.Ed.2d 381, 55 USLW 4576, 106 Lab.Cas. P 12,285

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.